IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

MAURICE HARRIS,
      Petitioner,

vs.                            Case No.:  4:15cv628/WS/EMT

JULIE L. JONES,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 14).  Petitioner filed a reply (ECF No. 16).

      The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the

opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 14).[1]  Petitioner was charged in the Circuit Court in and for Leon County, Florida, Case No. 2011-CF-1466, with one count of sexual battery (Ex. A at 5).  Following a jury trial, he was found guilty as charged (Ex. A at 11, Ex. C).  On December 12, 2011, Petitioner was sentenced to eight (8) years of imprisonment, with pre-sentence jail credit of 32 days (Ex. A at 22–31, 41–51).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D12-152 (Ex. A at 32, Ex. D).  The First DCA affirmed the judgment per curiam without written opinion on January 22, 2013, with the mandate issuing February 7, 2013 (Exs. G, H).  Harris v. State, 105 So. 3d 525 (Fla. 1st DCA 2013) (Table).

On October 23, 2013, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. I at 1–24).

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 14).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

The state circuit court ordered an evidentiary hearing and appointed counsel to represent Petitioner at the hearing (*id.* at 77–161). The circuit court denied the Rule 3.850 motion in an ordered rendered November 25, 2014 (*id.* at 65–68). Petitioner appealed the decision to the First DCA, Case No. 1D14-5765 (Ex. J). The First DCA affirmed the decision per curiam without written opinion on September 30, 2015, with the mandate issuing November 24, 2015 (Exs. M, N). Harris v. State, 177 So. 3d 610 (Fla. 1st DCA 2015) (Table).

On December 17, 2014, during the pendency of the post-conviction appeal, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D14-5820, alleging ineffective assistance of appellate counsel (Ex. Q). The First DCA denied the petition on the merits on January 12, 2015 (Ex. R). Harris v. State, 157 So. 3d 345 (Fla. 1st DCA 2015) (Mem). The court denied Petitioner's motion for rehearing on February 25, 2015 (Exs. S, T).

Petitioner filed the instant federal habeas action on December 18, 2015 (ECF No. 1).

## II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In relevant part, section 2254(d) now provides:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review

in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The

appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal
> habeas court to grant a state prisoner's application for a writ of habeas
> corpus with respect to claims adjudicated on the merits in state court.
> Under § 2254(d)(1), the writ may issue only if one of the following two
> conditions is satisfied—the state court adjudication resulted in a decision
> that (1) "was contrary to . . . clearly established Federal law, as
> determined by the Supreme Court of the United States," or (2) "involved
> an unreasonable application of . . . clearly established Federal law, as
> determined by the Supreme Court of the United States."  Under the
> "contrary to" clause, a federal habeas court may grant the writ if the state
> court arrives at a conclusion opposite to that reached by this court on a
> question of law or if the state court decides a case differently than this
> Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S.

156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme

Court has instructed that on any issue raised in a federal habeas petition upon which

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). "Clearly established Federal law, includes only the holdings, as opposed to the dicta, of the Supreme Court's decisions." Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (citation omitted).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct.

362, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State

court decision is found in either respect to be contrary, the district court must

independently consider the merits of the petitioner's claim.  However, where there is

no Supreme Court precedent on point, the state court's conclusion cannot be contrary

to clearly established federal law.  *See* Woods, 135 S. Ct. at 1377 (holding, as to claim

that counsel was per se ineffective in being absent from the courtroom for ten minutes

during testimony concerning other defendants:  "Because none of our cases confront

the specific question presented by this case, the state court's decision could not be

contrary to any holding from this Court." (internal quotation marks and citation

omitted)).

If on the other hand, the State court applied the correct Supreme Court

precedent and the facts of the Supreme Court cases and the petitioner's case are not

materially indistinguishable, the court must go to the third step and determine whether

the State court "unreasonably applied" the governing legal principles set forth in the

Supreme Court's cases.  The standard for an unreasonable application inquiry is

"whether the state court's application of clearly established federal law was

objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's

decision was an unreasonable application of a legal principle must be assessed in light

of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291 (citing Richter).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* Richter, 562 U.S. at 102; *see also* Gill, *supra,* at 1292 (the federal district court

may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C.

§ 2254(e)(1); *see, e.g.,* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied § 2254(d) does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless

the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS

A.    Ground One:  "Counsel was ineffective when failing to timely and properly challenge introduction of confession/incriminating statements made by Petitioner without proper showing of corpus delecti prior to, [sic] violating Petitioner's Sixth and Fourteenth Amendment [sic] of the U.S. Constitution."

Petitioner claims that his trial counsel was ineffective for failing to challenge admission of Petitioner's statements/confession, on the ground that the necessary corpus delecti for the charged offense was lacking (ECF No. 1 at 4–6).  Petitioner alleges that under Florida law, the State mush show the existence of prima facie proof of each element of the offense as a prerequisite to introducing a defendant's admission or confession into evidence.  Petitioner alleges he made incriminating statements and/or confessions in a "controlled call" between him and the victim, which was recorded by law enforcement.  Petitioner alleges defense counsel should have objected to admission of the phone call, on the ground that there was no independent direct or circumstantial evidence that he committed the sexual battery.  Petitioner alleges if counsel had challenged admission of the phone call, the phone call would not have

been admitted into evidence.  Petitioner asserts he presented this claim in his Rule 3.850 motion and post-conviction appeal (*id.* at 6).

Respondent concedes that Petitioner presented this claim in the Rule 3.850 motion and in the post-conviction appeal (ECF No. 14 at 12–13).  Respondent contends the First DCA's adjudication of the claim is entitled to deference under the AEDPA (*id.* at 13–16).

### 1. Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of Strickland is whether counsel's assistance was "reasonable considering all the circumstances."  Strickland, 466 U.S. at 691.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States,

218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do.'" Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d

1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).   Indeed,

"'[a]bsolute rules would interfere with counsel's independence—which is also

constitutionally protected—and would restrict the wide latitude counsel have in

making tactical decisions.'"  *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th

Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of

demonstrating prejudice is high.  *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th

Cir. 2002).  To establish prejudice, Petitioner must show "that every fair-minded jurist

would conclude 'that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.'" Jones

v. GDCP Warden, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting Strickland, 466 U.S.

at 694).  "A reasonable probability is a probability sufficient to undermine confidence

in the outcome," not that counsel's conduct more likely than not altered the outcome

of the proceeding.   *Id.* (citation omitted).   And Petitioner must show that the

likelihood of a different result is substantial, not just conceivable.  Williamson v. Fla.

Dep't of Corr., 805 F.3d 1009, 1016 (11th Cir. 2015) (citing Richter, 562 U.S. at 112).

"When a defendant challenges a conviction, the question is whether there is a

reasonable probability that, absent the errors, the factfinder would have had a

reasonable doubt respecting guilt." *Id.* at 695.  The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  *Id.* at 694–95.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal.  *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).  "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult."  Richter, 131 S. Ct. at 788. As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the

danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

*Id.* (citations omitted).

### 2. Federal Review of State Court Decision

Petitioner raised this claim as Ground One in his Rule 3.850 motion (Ex. I at 3–7). He argued that defense counsel should have challenged admission of the recorded phone call, in which he admitted he raped Ms. Smith. Petitioner argued that the State could not have satisfied the standard for admission of the phone call, set forth in Florida Statutes § 92.565(3) and cases applying that statute.

At the post-conviction evidentiary hearing, Petitioner's trial counsel, Attorney Peskin, testified that she was familiar with Florida Statutes § 92.565, and she believed that the evidence was sufficient to permit admission of the phone call (Ex. I at 115–16, 130–31).

The state circuit court adjudicated the claim as follows:

> The essence of the motion is found in ground number one. Mr. Harris alleges that Ms. Peskin was ineffective for failing to challenge the introduction of a controlled telephone call made by the victim to Mr. Harris on the date of the alleged crime. Ground One alleges that the confessions and statements contained in the recorded call were introduced without first establishing the corpus delicti of the crime

charged prior to the introduction of the recording containing the admission.

The victim, CS, was a reluctant witness. On the date of the incident, CS made detailed statements to her sister and to law enforcement. Later, she requested that the charges be dropped and informed the Assistant State Attorney that she would not be cooperative with her testimony. On the day of trial, the Court was informed of the victim's reluctance. The Court recessed the trial to allow CS to obtain counsel to assist her with her testimony. With her attorney in attendance at the trial, CS repeatedly answered Mr. Campbell's [the prosecutor's] questions with "I cannot remember." CS, however, did acknowledge making the detailed statements to the police immediately after the incident and that she had spoken with her sister the morning of the incident. CS acknowledged that she would not have lied to law enforcement.

Prior to introducing the controlled call through the testimony of CS, Mr. Campbell called as a witness a nurse, Kathy Walker, a forensic examiner with the Refuge House who testified to the physical examination conducted upon CS the morning after the alleged incident. The state also called as a witness, CS's sister, Brandy Smith who testified that on the morning after the alleged sexual battery CS contacted her crying and upset.

Much of CS's testimony consisted of Mr. Campbell asking CS about the statement she made to Law Enforcement later on the day of the incident. CS acknowledged that she was truthful with law enforcement when she had reported the incident the day after the attack.

The testimony presented by the state was legally sufficient to establish corpus delicti before the introduction of the controlled call between the victim and the defendant. Ms. Peskin could not have legally prevented the jury from hearing the contents of the call.

(Ex. I at 66–67).  The First DCA affirmed the lower court's decision without written opinion (Ex. M).

The relevant decision for purposes of 28 U.S.C. § 2254 is the First DCA's summary affirmance, which is the final state court adjudication on the merits of Petitioner's claim.  Wilson v. Warden, Ga. Diagnostic Prison, 834 F.3d 1227, 1235 (11th Cir. 2016) (defining the relevant decision for purposes of § 2254 review as the state appellate court's summary affirmance of the lower tribunal's decision), *petition for cert. filed*, No. 16-6855 (U.S. Nov. 15, 2016).  Where, as here, "the last adjudication on the merits provides no reasoned opinion, federal courts review that decision using the test announced in Richter."  Wilson at 1235.  The Richter test provides that "[w]here a state court's decision is unaccompanied by an explanation," a petitioner's burden under section 2254(d) is to "show[ ] there was no reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.  "[A] habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the] Court."  *Id.* at 102.

Here, under the <u>Richter</u> test, Petitioner must establish there was no reasonable basis for the First DCA to affirm the denial of relief on his ineffective assistance of counsel ("IAC") claim.  In reviewing the reasonableness of the First DCA's decision, this court may, but is not required to, look to the reasoning of the state court below (the state circuit court).  The Eleventh Circuit explained in <u>Wilson</u>:

> When the reasoning of the state trial court was reasonable, there is necessarily at least one reasonable basis on which the state [appellate] court could have denied relief and our inquiry ends.  In this way, federal courts can use previous opinions as evidence that the relevant state court decision under review is reasonable.  But the relevant state court decision for federal habeas review remains the last adjudication on the merits, and federal courts are not limited to assessing the reasoning of the lower court.

834 F.3d at 1239.

Petitioner contends defense counsel should have objected to admission of the phone call on the ground that the State failed to satisfy the corpus delecti rule.  The corpus delicti rule was described by the Florida Supreme Court as follows:

> It is a fundamental principle of law that no person be adjudged guilty of a crime until the state has shown that a crime has been committed.  The state therefore must show that a harm has been suffered of the type contemplated by the charges (for example, a death in the case of a murder charge or a loss of property in the case of a theft charge), and that such harm was incurred due to the criminal agency of another.  This usually requires the identity of the victim of the crime.  A person's confession to a crime is not sufficient evidence of a criminal act where no independent direct or circumstantial evidence exists to substantiate

> the occurrence of a crime.  The judicial quest for truth requires that no
> person be convicted out of derangement, mistake or official fabrication.

State v. Allen, 335 So. 2d 823, 825 (Fla. 1976) (footnote omitted). Traditional

application of the corpus delicti rule requires the State to "'at least show the existence

of each element of the crime' to authorize the introduction of a defendant's admission

or confession." State v. Colorado, 890 So. 2d 468, 470 (Fla. 2d DCA 2004) (quoting

Allen, 335 So. 2d at 825).  Without independently established corpus delicti, a

defendant's admissions or confessions cannot be admitted into evidence.  Chaparro

v. State, 873 So. 2d 631, 633 (Fla. 2d DCA 2004).  "The primary purpose behind the

rule is to protect a defendant from being convicted of a nonexistent crime due to

"derangement, mistake or official fabrication." Id. (internal quotation marks and

citations omitted).

Florida courts have held that Florida Statutes § 92.565 replaces the corpus

delicti rule with the "trustworthiness doctrine" with respect to the offenses

enumerated in that statute.[3]  See Geiger v. State, 907 So. 2d 668, 674 (Fla. 2d DCA

---

[3] Federal courts adhere to the "trustworthiness doctrine" in determining whether a defendant's admission or confession may be used to support a conviction. See Opper v. United States, 348 U.S. 84, 75 S. Ct. 158, 99 L. Ed. 101 (1954); Smith v. United States, 348 U.S. 147, 152, 75 S. Ct. 194, 99 L. Ed. 192 (1954).

2005); State v. Dionne, 814 So. 2d 1087, 1091 (Fla. 4th DCA 2002).  Section 92.565

provides, in relevant part:

> (2)  In any criminal action in which the defendant is charged with a crime against a victim under s. 794.011 [the statute under which Petitioner was charged] . . . the defendant's memorialized confession or admission is admissible during trial without the state having to prove a corpus delicti of the crime if the court finds in a hearing conducted outside the presence of the jury that the state is unable to show the existence of each element of the crime, and having so found, further finds that the defendant's confession or admission is trustworthy.

> (3) Before the court admits the defendant's confession or admission, the state must prove by a preponderance of evidence that there is sufficient corroborating evidence that tends to establish the trustworthiness of the statement by the defendant.  Hearsay evidence is admissible during the presentation of evidence at the hearing.  In making its determination, the court may consider all relevant corroborating evidence, including the defendant's statements.

Fla. Stat. § 92.565(2)–(3).

During Petitioner's trial, the State presented testimony from Laura Gereg, a

detective in the Tallahassee Police Department's Special Victims Unit (Ex. C at

75–81, 101–07).  Investigator Gereg testified that on May 7, 2011, she responded to

a report of a sexual battery, and made contact with the victim, Cierra Smith, at Ms.

Smith's apartment.  Gereg testified that Ms. Smith was transported to Tallahassee

Memorial Hospital for a sexual assault examination.  Investigator Gereg testified that

after the medical examination, she met with Cierra Smith at the police department.

Gereg testified that Ms. Smith described the details of an incident with Petitioner the night before. Investigator Gereg testified that during her contact with Cierra Smith, Ms. Smith seemed sober and was very well spoken. Gereg testified that Ms. Smith was able to articulate and describe exactly what happened with Petitioner the previous night. Gereg testified that she asked Ms. Smith to participate in a "controlled call" with Petitioner, during which Ms. Smith would call Petitioner from her own cell phone, and the conversation would be recorded by law enforcement. Investigator Gereg testified that Ms. Smith agreed to make the controlled call, and the call was made at 11:00 p.m. Investigator Gereg identified State's Exhibit C as the audio recording of Ms. Smith's telephone conversation with Petitioner. Investigator Gereg testified that she made contact with Petitioner on May 8, 2011. Gereg testified that she advised Petitioner of his Miranda rights, and he signed a form acknowledging that he was advised of his rights and that he wished to talk to Gereg. The Miranda form was admitted into evidence. Investigator Gereg testified that during her interview with Petitioner, he admitted that he had sex with Cierra Smith on May 7, 2011.

Nancy Walker, a registered nurse at Tallahassee Memorial Hospital, testified that she was certified as a forensic examiner with a specialty in sexual assault examinations (Ex. C at 29–36). Nurse Walker testified that during a sexual assault

examination, she interviews the patient and asks her or him to describe what happened.  Walker testified that she then documents any injuries and, based upon what the patient reports, Walker collects evidence and provides it to law enforcement. Nurse Walker testified that she performed a sexual assault examination on Cierra Smith on May 7, 2011.  Nurse Walker testified that she interviewed Ms. Smith and obtained details about what happened to her.  Walker testified that she collected Ms. Smith's clothing and performed an external examination of Ms. Smith's vulva and anal area, as well as an internal pelvic examination.  Nurse Walker testified that Ms. Smith told her that she was bitten on the left buttock, and Walker noted a red area on Ms. Smith's left buttock.  Walker testified that a police officer took a photograph of the mark.  The photograph was admitted into evidence.  Nurse Walker testified that her internal and external examinations of Ms. Smith's genitalia did not indicate any physical signs of trauma; however, Walker further explained that physical trauma is visible in less than 10 percent of cases involving consensual or nonconsensual intercourse, and that physical signs of trauma are usually observable only when a foreign object is used during the sexual assault.

The State also provided testimony from the victim's sister, Brandy Smith (Ex. C at 37–40).  Brandy Smith testified that she spoke with her sister, Cierra Smith, on May 7, 2011.  Brandy testified that her sister was crying and upset.

Cierra Smith testified that she did not want to testify at Petitioner's trial (Ex. C at 42–61).  Ms. Smith testified that she still cared for Petitioner, and did not want to see him get into trouble.  Ms. Smith testified that she understood that if she lied during her trial testimony, she would be committing a crime.  Ms. Smith testified that she did not remember Petitioner coming to her house on the night of May 6, 2011 and into the early morning of May 7.  She testified that she did not remember speaking with law enforcement officers about what happened that night.  Ms. Smith testified that she did not remember going to the hospital and being examined by a nurse.  Ms. Smith testified that she did not remember what she discussed with Detective Gereg.  Smith testified that she has never lied to law enforcement.  She testified that if she had an interaction with law enforcement in May of 2011, she would not have lied to them.

The prosecutor asked Ms. Smith whether she remembered telling police she "told Harris [Petitioner] to stop, that you didn't want to do this, and that you scratched him and tried to push him off, and tightened your legs to keep him from penetrating?"

(Ex. C at 55).  Ms. Smith indicated she did not remember (*id.*).  The prosecutor then asked Smith if she remembered telling police that Petitioner overpowered her and "forcibly put his penis inside your vagina and began having sex with you?" (*id.* at 56). Ms. Smith again responded, "I don't remember." (*id.*).  The prosecutor inquired, "But if you told them the truth back then, it must have happened, right?" and Smith replied, "I would tell the police the truth." (*id.*).  The prosecutor asked Ms. Smith if she remembered speaking with the nurse at the hospital (*id.* at 57).  Ms. Smith responded, "I remember her asking questions," but Smith stated she did not remember showing the nurse where her buttocks had been bitten (*id.*).  The prosecutor then asked, "If you said that happened, you wouldn't have lied to the nurse . . . would you?" (*id.*).  Ms. Smith replied that she would not lie to the nurse (*id.*).

Ms. Smith admitted that it was her voice in the recorded phone conversation, and that the other voice sounded like Petitioner's.  During the recorded conversation, Petitioner stated the following:

> THE VICTIM:   I mean, did it—do you know how many times you did it last night?

> THE DEFENDANT:  Three.

> THE VICTIM:  Three times last night, and how many times this morning?

THE DEFENDANT:  Once?

THE VICTIM:  Try twice.

THE DEFENDANT:  Twice?

THE VICTIM:  Was all that necessary?

THE DEFENDANT:  At the time I felt like it was.

THE VICTIM:  It was necessary to do—to rape me six— five or six times?  Do you think it was rape, or do you think it was—what did you think it was, regular?

THE DEFENDANT:  It was just, like, you know (inaudible).  I just, like—

THE VICTIM:  You just what?

THE DEFENDANT:  I wanted it to be regular.

THE VICTIM:  You want it to be regular, but you was forcing me to do stuff.  And even when I was, like, I'm just laying [sic] there, how could you keep going if I'm just laying [sic] there?

THE DEFENDANT:  Probably drawing a blank.

THE VICTIM:  Say what?

THE DEFENDANT:  I was drawing a blank.  I don't know.

THE VICTIM:  You was [sic] blank?

THE DEFENDANT:  Yeah.  I was just numb.

THE VICTIM:  Blank because you didn't want to think about what you was [sic] doing, or because you didn't care, or because—

THE DEFENDANT:  No.  I was blank because, you know—I wasn't blank, but I was, like, blank to the situation.  I was—I was—I was feeling like—as I was in there, I was just feeling like everything—it's just everything—I wanted to feel okay, like.

THE VICTIM:  So five times you wanted to feel okay?

THE DEFENDANT:  No.  I wanted to feel like everything was okay with me.  Like, I just wanted to feel accepted.
. . . .
THE VICTIM:  Yeah.  I don't know what I'm going to do, but—how come you won't say it?

THE DEFENDANT:  Say what?  Hello?

THE VICTIM:  Say that you raped me.  Say that you—you won't say that word.  Are you—are you—you don't want to think about it or whatever?  And I don't know why—

THE DEFENDANT:  No.  I think about it.  I think about—I do think about it.  I thought about it.  I thought about it all day.

THE VICTIM:  So why don't you say it?  Because I don't think you think it's wrong.

THE DEFENDANT:  It is wrong (inaudible).  It's wrong that I raped you, yeah.

THE VICTIM:  That just sounds so scary when you say it, too.

THE DEFENDANT:  I was (inaudible).

THE VICTIM:  Huh?

THE DEFENDANT:  I regret what I did.

. . . .

THE VICTIM:  I'm still—I'm still afraid of you.  What if I—would you be mad at me if I—if I did call the police?  I'm just scared.

THE DEFENDANT:  I'm sorry.

THE VICTIM:  You're sorry.  But would you be mad at me?  Would you—would you try to—I'm afraid.  I feel like I'm by myself.  I just—I don't know.

THE DEFENDANT:  I miss you.  Look, just—

THE VICTIM:  You keep saying you're sorry, Maurice.  Why?  What are you sorry for?

THE DEFENDANT:  For making you feel this way.  That's why I'm sorry.  I'm sorry for hurting you.  That's why I'm sorry.  I'm sorry for hurting you.  I'm sorry for making you feel this way.  I'm sorry for not being there.  I'm just being foolish.

THE VICTIM:  You're sorry for being a pedophile for forcing yourself on me?

THE DEFENDANT:  Yeah.  I'm sorry for raping you, yeah.  I'm sorry for forcing, yeah, myself on you.  I apologize for everything.

(Ex. C at 89–101).

During her trial testimony, Ms. Smith continued to state that she did not recall the events of May 6–7, including any conversations with police; however, she reiterated that she would have told the truth to police if she talked to them (Ex. C at 45–48, 52–57).  Ms. Smith testified that she remembered the nurse at the hospital

asking her questions (*id.* at 57).  Ms. Smith testified that she would not lie to the nurse (*id.*).  Ms. Smith testified that she did not remember drinking alcohol on the night in question, but that it was possible.  She testified it was possible that she was drunk on the night of May 6.  Ms. Smith testified that she talked to her sister on May 7, but she did not remember what she told her sister.  She testified that she would not lie to her sister.

Ms. Smith admitted that she gave money to Petitioner's mother to bond Petitioner out of jail (Ex. C at 61–68).  She testified that she and Petitioner dated and had a sexual relationship after he bonded out of jail.  Ms. Smith also testified that she felt pressure from the State Attorney's Office to testify in the case.  She testified that she provided sworn statements to the State Attorney's Office and Petitioner's counsel stating that she did not wish for the State to pursue the charge against Petitioner.  Ms. Smith admitted that in neither of the statements did she state that the reason she wished for the charges to be dropped was that the sexual battery never occurred or that she could not remember it.

Jeremy Izquierdo testified that he was working as a patrol officer with the security department of Florida State University on May 8, 2011 (Ex. C at 69–74).  Mr. Izquierdo testified that on that day, he was dispatched to a parking area, where he

made contact with Petitioner.  Mr. Izquierdo testified that he found Petitioner and
Cierra Smith in the back seat of a vehicle parked on top of one of the campus parking
garages.  Mr. Izquierdo testified that Petitioner was wearing only boxer shorts, and
Ms. Smith was wearing a bikini.   Mr. Izquierdo testified that he found two bottles of
alcohol on a ledge of the top of the parking garage, and he found Petitioner's clothes
on the floor of the parking garage in a position as if they had been dropped off the
ledge. Mr. Izquierdo testified that he spoke with Cierra Smith, and she provided a lot
of information about what had happened earlier that evening, as well as the night
before.

Although this was the evidence presented at Petitioner's trial, it is not all of the
evidence that the State could have presented if defense counsel had challenged the
admissibility of Petitioner's admissions during the recorded phone call.  If Petitioner's
counsel had challenged the admissibility of the phone call, on grounds of corpus
delecti, the State could have presented hearsay evidence at the admissibility hearing
under § 92.565(3).  The State thus could have presented Ms. Smith's statements to
Investigator Gereg, which are included in Gereg's sworn Arrest/Probable Cause
Affidavit (*see* Ex. A at 6–8).  According to Investigator Gereg, Ms. Smith described
the events of May 6–7 as follows:

On Saturday, May 7, 2011, the victim, Cierra Smith, called the Tallahassee Police Department to report a sexual battery that had just occurred at her residence.  The victim lives at 1320 Lake Avenue #206 in Tallahassee, Florida.

The suspect in the sexual battery was her ex-boyfriend, Maurice Harris (B/M 6-12-89).

The victim stated that Harris came to Tallahassee last night (5/6/11) from Georgia and called her on her cell phone around 1130 pm.  Harris told the victim that he was outside and told the victim to let him in.  The victim initially thought Harris was joking until she heard the sound of a train in the background and realized that there was a train going by near her residence at the same exact time.

The victim told Harris she was not going let him inside.  The victim's apartment is enclosed inside a secure black iron gate that is approximately 6 feet in height.  Harris climbed over the gate and began banging on the front door of the victim's apartment.  The victim advised she did not want to let Harris in but she also did not want to cause a disturbance for her neighbors so she opened the door.  Harris had injured his leg in the process of jumping the fence and had to scoot in through the apartment door on his butt due to the injury.

Once Harris was inside, he laid on the floor in the living room and was trying to stretch his injured leg out.  The victim spoke with Harris for a short time and then fell asleep around midnight on the couch.  The victim was only wearing a bra and panties but had covered up with a purple wrap.  Harris was still on the floor at that time.

When the victim woke up, Harris was on the couch with her, naked and lying behind her.  Harris was propped up and was looking through the victim's cell phone and in doing so discovered text messages sent from the victim to another male.  Harris confronted her about the messages and the victim told Harris that she had sex with another man.  The victim

said that Harris punched the wall, just above the couch, after she told him that and he cut his hand.

Harris then told the victim that this would be the last time he was coming down here so he was going to get what was his.  Harris then pulled the victim from the couch onto the floor in the living room and proceeded to get the victim's panties off.  The victim told Harris to stop; she told him she didn't want to do this.  The victim scratched Harris and tried to push him off of her and tightened her legs to keep him from penetrating her. The victim said that Harris overpowered her and forcefully put his penis inside of her vagina and began having sex with her.  Harris [sic] even attempted to plea [sic] with Harris by telling him that she was not supposed to have sex right now because she had a yeast infection and the doctor told her not to have sex.  Harris continued to sexually batter the victim until he ejaculated inside the victim

The victim advised, after Harris had sex with her in the living room, he forced her to the bedroom by picking her up, carrying her to the bedroom and putting her on the bed (air mattress).  Harris forced the victim to have sex a total of about 5 more times from the initial sexual battery until the last sexual battery that occurred the following morning. The victim advised Harris did not use a condom and ejaculated inside of her every time they had sex.  The victim stated that after each ejaculation that Harris had, the victim was made to wipe Harris' penis with a washcloth. The washcloth used was located on scene and impounded as evidence.

Following each sexual battery, the suspect would wrap the victim up in his arms and would fall asleep like that.  The victim felt as if she could not move without waking him up so she could not leave or call anybody. The victim stated that when she would get up to use the bathroom, if she even went near the bedroom door, the suspect would sit up on the bed and put his arm out as to stop her so the victim was too scared to try and leave.

Following the last sexual battery that occurred the following morning (5/7/11), Harris told the victim he was going to leave his mark on her

and bit her buttocks.  There was a photograph taken of some redness to the victim's left butt cheek but it was not a clear bite mark.  There were no other known injuries at that time.

The next morning Harris started talking about how he could not live without the victim and that he wanted to work things out with her. Harris proceeded to grab two steak knives from the kitchen and threaten to kill himself.  Harris then asked the victim to kill him and when the victim refused, then he threatened to kill her and then kill himself.

The victim was scared that Harris would attempt to hurt himself as he has a history of doing so.  The victim attempted to calm him down by telling him she would try to work things out with him.  Harris eventually gave the knives to the victim.  The victim took the knives and threw them into the bedroom on the bed, which was the room farthest and hardest to get to.  The knives were still present on the bed when this investigator arrived and digital photographs were taken of the knives.

Harris and the victim sat on the couch and talked for a short time before the suspect left the residence around 12 noon.  The suspect had to travel home to Albany, Georgia where he lived and worked.  Harris was scheduled to be to work at 2:00 pm that date.

Once the suspect left her apartment, the victim called her uncle and her sister and then called this agency to make a police report.

(Ex. A at 7–8).

Although an ineffective assistance of counsel claim is a federal constitutional claim which the court considers in light of the clearly established law of Strickland, when "the validity of the claim that [counsel] failed to assert is clearly a question of state law, . . . we must defer to the state's construction of its own law." Alvord v.

Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984) (explaining, in the context of an ineffective assistance of appellate counsel claim, that "[o]n the one hand, the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension," but, "[o]n the other hand, the validity of the claim [counsel] failed to assert is clearly a question of state law, and we must defer to the state's construction of its own law.") (citations omitted)[4]; *see also* Callahan v. Campbell, 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for failing to make a state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts on matters of state law); Herring v. Sec 'y Dep't of Corr., 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying federal habeas relief on ineffective assistance claim based on counsel's failure to make state law-based objection; holding that the Florida Supreme Court's conclusion that the proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim:

---

[4] Alvord was superseded by statute on other grounds as noted in Hargrove v. Solomon, 227 F. App'x 806 (11th Cir. 2007).

"The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (alterations in original) (quoting <u>Agan v. Vaughn</u>, 119 F.3d 1538, 1549 (11th Cir. 1997)).

Here, as in <u>Alvord</u>, <u>Callahan</u>, and <u>Herring</u>, the state court has already answered the question of whether defense counsel had a meritorious basis for challenging admission of phone call, on the ground that the necessary corpus delicti for the charged offense was lacking—counsel did not. This court must defer to the state court's determination of state law. The failure by Petitioner's counsel to assert a challenge to the admissibility of the phone call cannot be deemed deficient performance, and Petitioner cannot show he was prejudiced by counsel's failure to raise this issue, because such a challenge had no arguable basis for success.

Petitioner failed to demonstrate that the state court's rejection of the IAC claim asserted in Ground One was contrary to, or an unreasonable application of, <u>Strickland</u>. Therefore, Petitioner is not entitled to relief on Ground One.

B.   <u>Ground Two: "Counsel was ineffective for failing to move to suppress controlled call made to Petitioner prior to trial where Petitioner had legal</u>

grounds and standing to do so as an aggrieved party as the alleged victim had not voluntarily consented to the call, thus violating Petitioner's Sixth and Fourteenth Amendment rights."

Petitioner alleges prior to trial, he informed defense counsel that Ms. Smith told him that she was coerced and pressured by police to make the controlled call to Petitioner from the police station  (ECF No. 1 at 7–8).  Petitioner contends defense counsel should have moved to suppress the controlled call on the ground that the recording was unlawful, pursuant to Florida's wiretap statutes, because Ms. Smith did not voluntarily consent to participate in the call (*id.*).  Petitioner contends if defense counsel had made a motion to suppress, there is more than a reasonable probability that the court would have granted the motion, because Ms. Smith would have testified that she felt forced and compelled to make the call.  Petitioner asserts he presented this claim in the Rule 3.850 motion and post-conviction appeal (*id.* at 9).

Respondent concedes that Petitioner presented this claim in the Rule 3.850 motion and in the post-conviction appeal (ECF No. 14 at 16).  Respondent contends the First DCA's adjudication of the claim is entitled to deference under the AEDPA (*id.* at 16–18).

1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Two in his Rule 3.850 motion (Ex. I at

8–10).  The state circuit court adjudicated the claim as follows:

> Ground Two alleges that Ms. Peskin was ineffective by failing to
> move to suppress the controlled call.  Defendant argues that the victim
> was coerced by the police to make the call.  There was no credible
> evidence produced at the hearing to support the theory that the victim
> was coerced by police.  Defendant's motion on Ground Two is denied.

(Ex. I at 67).  The First DCA affirmed the decision without written opinion (Ex. M).

Florida's wiretap statutes provide that any aggrieved person (defined as a

person who was a party to any intercepted wire or oral communication, or a person

against whom the interception was directed, *see* § 934.02(9)), in any trial may move

to suppress the contents of any intercepted wire or oral communication, or evidence

derived therefrom, on the ground that the communication was unlawfully intercepted.

Fla. Stat. § 934.09(10).  The statutes provide that it is lawful for an investigative or

law enforcement officer to intercept a wire  or oral communication when one of the

parties to the communication has given prior consent to such interception and the

purpose of such interception is to obtain evidence of a criminal act.  *See* Fla. Stat.

§ 934.03(2)(c).

As previously noted, Cierra Smith testified at trial that she felt pressure from the State Attorney's Office to testify in the case (Ex. C at 62) (emphasis added).  Ms. Smith did not testify that she felt any pressure to participate in the controlled call—in fact, Smith testified that she did not remember making the controlled call (*id.* at 52). Additionally, there was no evidence adduced at the post-conviction evidentiary hearing which showed that Ms. Smith did not voluntarily consent to participate in the controlled call.

The state court reasonably determined that there was no credible evidence suggesting that Ms. Smith was coerced by police to participate in the controlled call. In the absence of any evidence suggesting coercion, there was no basis for defense counsel to seek suppression of the controlled call under Florida's wiretap statutes. The state court's adjudication of Petitioner's claim was not based upon an unreasonable determination of the facts, nor was the adjudication contrary to or an unreasonable application of Strickland.

> C.   Ground Three:  "Trial counsel was ineffective when presenting the boilerplate motion for judgment of acquittal, which failed to adequately and sufficiently set out legal grounds to support motion, while also sufficiently preserving the issue for appeal, violating Petitioner's Sixth and Fourteenth Amendment rights."

Petitioner alleges the State failed to present sufficient evidence that he actually penetrated the victim's vagina (ECF No. 1 at 10–11).  Petitioner acknowledges that in the controlled call between him and Ms. Smith, he admitted he had sex with her and apologized for raping her, but Petitioner contends that both sex and rape may be performed in different ways, and there was insufficient evidence to prove that he actually penetrated Ms. Smith.  Petitioner contends defense counsel was ineffective for failing to include this argument in counsel's motion for judgment of acquittal.  He contends that if counsel had included this argument, the outcome of the trial would have been different.  Petitioner asserts he presented this claim in his Rule 3.850 motion and post-conviction appeal (*id.* at 11).

Respondent concedes that Petitioner presented this claim in the Rule 3.850 motion and in the post-conviction appeal (ECF No. 14 at 18).  Respondent contends the First DCA's adjudication of the claim is entitled to deference under the AEDPA (*id.* at 18–19).

1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground Three in his Rule 3.850 motion (Ex. I at 11–13).  The state circuit court adjudicated the claim as follows:

> The Defendant alleges in Ground Three that Ms. Peskin only made a "boiler plate" motion for Judgment of Acquittal.  The motion for JOA was made and argued by Ms. Yeary [Ms. Peskin's co-counsel].  The motion and the arguments were thoughtful and forcefully put forth.  Defendant admitted, post Miranda to having sex with the victim.  Defendant's motion on Ground Three is denied.

(Ex. I at 67).  The First DCA affirmed the decision without written opinion (Ex. M).

In Florida, a trial court generally should not grant a motion for judgment of acquittal unless, "when viewed in a light most favorable to the State, the evidence does not establish a prima facie case of guilt."  Dupree v. State, 705 So. 2d 90, 93 (Fla. 4th DCA 1998) (en banc).  "When moving for a judgment of acquittal, a defendant admits not only the facts stated in the evidence, but also every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence."  Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974).  "The trial court has the task of reviewing the evidence to determine whether competent, substantial, evidence exists from which the jury could infer guilt to the exclusion of all other inferences."  State v. Law, 559 So. 2d 187, 189 (Fla. 1989).

"Competent evidence is matter probative of the fact to be proved; that is, relevant evidence that does not fit within any rule of exclusion.  Evidence is

substantial if a reasonable mind might accept it to support a conclusion." Brumley v.
State, 500 So. 2d 233, 234 (Fla. 4th DCA 1986). "Hence, a judgment of acquittal
should not be granted where the State has produced competent, substantial evidence
to support every element of the crime." Gay v. State, 607 So. 2d 454, 457 (Fla. 1st
DCA 1992).

Here, the trial transcript demonstrates that defense counsel's motion for
judgment of acquittal was not "boilerplate" or "bare bones" (Ex. C at 108–13).
Counsel argued that the State presented insufficient evidence that the sexual
intercourse was nonconsensual (*id.*). The trial court denied the motion for JOA, on
the ground that the evidence presented a jury question as to whether Petitioner
sexually battered Ms. Smith (*id.* at 113–14).

Regarding the penetration element, during trial, the prosecutor elicited the
following testimony from Ms. Smith regarding the penetration issue:

> Q [by the prosecutor]. Do you remember telling the police that he
> pulled you from the couch and pulled your panties off?
>
> A. I don't remember.
>
> Q. But you would have told them the truth about that, right?
>
> A. If ever I had to talk to the police, I tell them the truth.

Q.  You told them that you—you told the police that you told Harris to stop, that you didn't want to do this, and that you scratched him and tried to push him off, and tightened your legs to keep him from penetrating; do you remember saying that?

A.  I don't remember.

Q.  Do you remember that happening?

A.  I don't remember.

Q.  But if you told the police, it must have happened, right?

A.  The question?

Q.  If you told the police, and you tell the police the truth every time, then it must have happened, right?

A.  I don't remember, so.

Q.  And you told the police that he overpowered you and forcibly put his penis inside your vagina and began having sex with you; do you remember telling the police that?

A.  I don't remember.

Q.  But if you told them the truth back then, it must have happened, right?

A.  I would tell the police the truth.

Q.  Do you remember telling them that throughout the night, that this happened five more times?

A.  I don't remember.

Q. Do you remember telling the police that after each ejaculation, he made you—he made you wipe off his penis with a white washcloth?

A. I don't remember.

Q. But if you told them that, that must have been the way it happened back in May, right?

A. If at any time I had to talk to the police.

(Ex. C at 55–57). The prosecutor also presented Petitioner's admissions, during the controlled call and his interview with Investigator Gereg, that Petitioner "raped" and had sex with Ms. Smith.

Given the evidence, it was reasonable for defense counsel to focus her JOA argument on the consent issue, not the penetration issue. Further, given the evidence, there is no reasonable probability the trial court would have granted the motion for JOA if defense counsel had included argument on the penetration issue. The prosecutor presented evidence from which the jury could infer, to the exclusion of all other inferences, that Petitioner penetrated Ms. Smith's vagina.

The state court reasonably concluded that defense counsel was not ineffective for failing to include argument on the penetration issue in the motion for JOA. Petitioner has failed to demonstrate he is entitled to federal habeas relief on Ground Three.

D.     Ground Four: "Counsel rendered ineffective assistance when exercising a trial strategy to do nothing, denying Petitioner of a fair trial, and prejudicing the outcome, violating Petitioner's Sixth and Fourteenth Amendment rights."

Petitioner alleges defense counsel was ineffective for failing to prepare a defense, including deposing the victim, Ms. Smith (ECF No. 1 at 12–13).  Petitioner alleges if defense counsel had deposed Ms. Smith, counsel would have discovered the following evidence:  (1) Ms. Smith was pressured and persuaded by law enforcement to make the controlled call that was published to the jury; (2) Ms. Smith did not remember what took place the night of the alleged sexual battery; and (3) Ms. Smith had consumed an excessive amount of alcohol on the night of the offense.  Petitioner alleges defense counsel knew prior to trial that Ms. Smith did not want Petitioner prosecuted for the charged offense, nor did she wish to testify against him.

Additionally, Petitioner contends defense counsel should have better prepared a defense to the controlled call (ECF No. 1 at 13).  Petitioner contends defense counsel should have listened to the controlled call prior to the morning of trial, and researched Florida's wiretap laws.  Petitioner contends if defense counsel had engaged in this pre-trial preparation, counsel could have sought suppression of the controlled call, on the ground that Ms. Smith did not voluntarily consent to participate in the call, and counsel could have made more developed arguments in defense of the charge.

Petitioner asserts he presented this claim in the Rule 3.850 motion and post-conviction appeal (*id.*).

Respondent appears to concede Petitioner exhausted this claim (ECF No. 14 at 20).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 20–21).

> 1. Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

> 2. Federal Review of State Court Decision

Petitioner raised this claim as Ground Four in his Rule 3.850 motion (Ex. I at 14–16).  At the post-conviction evidentiary hearing, Attorney Peskin provided the following testimony relevant to Ground Four:

> Q.  Okay.  And did you ensure that you had received all the discovery in this case?

> A.  Yes.

> Q.  Are you experienced in the fact of various motions to compel, demands for discovery, depositions and other discovery procedures to get all the discovery that's relevant?

> A.  Yes.

> Q.  And in dealing with me, have you tried a lot of cases and worked with me over the years?

A.  I have.

Q.  At any point during this process did you feel that you didn't have any information that you needed?  Did you fail to get it or have you ever—

A.  I think there was—Mr.—part of Mr. Harris's complaint is that we got the transcript from the controlled call late in the game.  And I do remember speaking with you about that.  We were provided with it.  And even prior to that, I believe, you and I had numerous discussions as to what the content of the call was.

Q.  Regardless, was this a fairly strong defense case, based on the victim's status?

A.  I wish that I could say it was a strong defense case.  It was not.  It's very difficult to overcome a situation where you have a client who is charged with rape, essentially, saying in a controlled call, I'm sorry I raped you. I think that's a very unfortunate—unfortunate response.  And there just wasn't—I mean, I don't think there was anything we could have done to get past that.

Q.  Did you, prior to trial, understand that the victim in this case was not going to cooperate with me in proceeding?

A.  I believe that was brought to my attention by Mr. Harris.  I think you and I had spoken about it, as well, prior to the trial.

Q.   Regardless of her lack of cooperation, based on your experience in working as a defense attorney, is it unusual for the State to have a hostile victim or have witnesses work against us?

A.  No, unfortunately it happens all the time.

Q.  And did you discuss with him the fact that just because she wasn't going to cooperate, that there was still this controlled call that was going to be a problem?

A.  Yes, I did.

Q.  Regardless, did he make a decision that he wanted to proceed to trial?

A.  Yes.

. . . .

Q.  And going to one of the allegations that's been raised, depositions.  Do you take depositions of every witness in every case?

A.  No.

Q.  Why not?

A.  Well, most of the time I know what the witnesses are going to say, especially police officers.  They obviously write a report. Other—other witnesses I either can have contact with outside of a deposition, or I have enough information from the client, or maybe there is something I know that the deponent might say and so I want to save that for trial.  So there could be a variety of reasons.

Q.  In this case, did you make a tactical decision not to depose the victim, or others, in preparing for trial?

A.  Yes, I did.

Q.  Particularly based on your client telling you that she was going to be hostile, did you think that that might hurt or might equip me or get me ready for her if you did a deposition that would be to y'all's detriment?

A.  Yes.

. . . .

      Q.  Going to the fourth complaint, we've already discussed your lack of deposition.  Once again, that was a tactical decision for you?

      A.  Yes.

(Ex. I at 111–14, 118).  Attorney Peskin reiterated that even though she did not listen to the controlled call until the morning of trial, she was previously aware that it included Petitioner's admission to raping Ms. Smith, because either Petitioner told her about it or that information was included in the arrest report (Ex. I at 122–23, 128, *see also* Ex. A at 8).

      The state circuit court adjudicated Ground Four as follows:

> The allegations in Ground Four are that Defense counsel did not take the deposition of the victim.  Ms. Peskin knew that the victim did not want to proceed with the case.  The State was aware of that fact as well.  No benefit to the defense could be obtained by memorializing the testimony of the victim.  The decision not to depose the victim is a trial strategy that this Court cannot second guess.  Ground Four is denied.

(Ex. I at 67).  The First DCA affirmed the lower court's decision without written opinion (Ex. M).

      The evidence adduced at the post-conviction hearing supports the state court's factual finding that Attorney Peskin made a strategic decision not to depose the victim.  Additionally, it was reasonable for the state court to conclude that Peskin was not ineffective for failing to depose the victim, or failing to listen to the controlled call

(or read a transcript of it) prior to the day of trial.  Attorney Peskin knew Ms. Smith's description of the events that transpired on the night of the offense, and Peskin knew that Petitioner had admitted during the controlled call that he raped Ms. Smith—all of those facts were included in the arrest report (*see* Ex. A).  Additionally, Peskin knew prior to trial that Ms. Smith was a reluctant witness, and that Smith had notified both the prosecutor and defense counsel that she did not want the State to prosecute the charge. The only information that Petitioner alleges could have been gained by deposing Ms. Smith is a statement that she did not voluntarily consent to participating in the controlled call, but Petitioner failed to provide the state court with any evidence that Ms. Smith would have testified to facts suggesting a lack of voluntary consent.

Petitioner failed to demonstrate a reasonable probability the result of his trial would have been different if Attorney Peskin had conducted depositions or listened to the controlled call (or read a transcript) prior to the morning of trial.  The state court's rejection of Petitioner's IAC claim was not contrary to or a unreasonable application of <u>Strickland</u>.  Therefore, Petitioner is not entitled to relief on Ground Four.

E.     Ground Five: "Counsel was ineffective when depriving the Petitioner of his constitutional right to testify on his own behalf, thus violating Petitioner's Sixth and Fourteenth Amendment rights."

Petitioner alleges he informed defense counsel that he wished to testify in his own defense, but counsel refused to allow him to do so (ECF No. 1 at 15).  Petitioner alleges if defense counsel had permitted him to testify, he would have testified to the following:  (1) his statements to Investigator Gereg were made under duress, because he was under the influence of sleeping pills and alcohol, and had just been released from a mental institution; (2) his statements during the controlled call were made only to pacify Ms. Smith and to "cease her quabbling"; (3) his statements during the controlled call were the result of repeated "questioning/drilling" from Ms. Smith; (4) at the time of the controlled call, he had no recollection of the conduct of which Ms. Smith was accusing him; and (5) prior to trial, both he and Ms. Smith wished to pursue dismissal of the charges.

Respondent appears to concede Petitioner exhausted this claim (ECF No. 14 at 21–22).  Respondent contends Petitioner's assertion that defense counsel refused to allow him to testify is belied by the trial colloquy and refuted by Petitioner's and Attorney Peskin's testimony at the post-conviction evidentiary hearing.  Respondent

contends the state court's adjudication of Ground Five was not contrary to or an unreasonable application of clearly established federal law (*id.* at 22–23).

In Petitioner's reply, he clarifies that he does not dispute that he, himself, made the decision not to testify (ECF No. 16 at 4).  Petitioner contends defense counsel's advice that he not to testify was deficient.

### 1. Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

### 2. Federal Review of State Court Decision

Petitioner raised this claim as Ground Five in his Rule 3.850 motion (Ex. I at 17–20).  At the post-conviction evidentiary hearing, Petitioner testified that he based his decision not to testify on defense counsel's advice (Ex. I at 91).  Petitioner testified that the substance of his trial testimony would have been the following:

> That the—the only—what I could see by reading the transcripts, I only saw that it was—the most crucial evidence was my voice, the recording.  And I believe that if I would have testified, I could have, you know, cleared that up.

> That by the phone call, the phone call being made, I just was telling her what she wanted to hear, just to—just to try to see her that night.  It seems like she was, you know, hurt, and I really didn't know why.  But she was asking me questions and I just agreed to just—just really shut her up about that situation.

> But all what—that I said was really, like, it was asked from her.
> I didn't get anything from my memory. I didn't get anything from what
> I knew. It was just she gave the details and I agreed with her. And that
> was it.

(Ex. I at 91). On cross-examination, Petitioner admitted that he, not defense counsel, made the decision that he would not testify (*id.* at 96). Petitioner testified that he made that decision based upon defense counsel's advice that he not testify (*id.*). When asked if counsel gave him a reason why he should not testify, Petitioner responded no (*id.* at 90).

Attorney Peskin testified that she and co-counsel Yeary advised Petitioner that they did not believe it was necessary for him to testify, and prior to the trial court's colloquy, they "spent some time . . . speaking with [Petitioner] and making sure that that's what he wanted to do" (Ex. I at 118, 120). Peskin testified that the defense case did not rest on Petitioner's testimony, but on the victim's testimony and her lack of credibility (*id.* at 119). Attorney Peskin testified that she feared that Petitioner's testifying could diminish any pro-defense feeling the jury may have had resulting from the victim's clear reluctance to testify and participate in the prosecution (*id.*).

The state circuit court denied Petitioner's IAC claim (Ex. I at 67). The First DCA affirmed the decision without written opinion (Ex. M).

The state court's rejection of Petitioner's claim was reasonable.  Petitioner failed to demonstrate that Attorney Peskin's advice that he not testify was advice that no competent counsel would have given.  Further, there is no reasonable probability the jurors would have returned a different verdict if they had heard Petitioner testify that the only reason he admitted to Ms. Smith that he raped her was to appease her and shut her up.  Petitioner is not entitled to federal habeas relief on Ground Five.

F.     Ground Six:  "Counsel provided ineffective assistance where the cumulative effect of multiple errors committed throughout pretrial and trial proceedings contributed to Petitioner's conviction, thus violating Petitioner's Sixth and Fourteenth Amendment rights."

Petitioner alleges that the cumulative effect of the deficiencies of defense counsel  identified in Grounds One through Five deprived him of effective assistance of counsel (ECF No. 1 at 17).  Petitioner asserts he presented this claim in his Rule 3.850 motion and post-conviction appeal (*id.* at 17–18).

Respondent appears to concede Petitioner exhausted this claim (ECF No. 14 at 23).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 24–25).

Petitioner raised this claim as Ground Six in his Rule 3.850 motion (Ex. I at 21–22).  The state circuit court denied Petitioner's "cumulative effect" claim on the ground that Petitioner failed to show that any of his individual IAC claims were

meritorious (*id.* at 67).  The First DCA affirmed the decision without written opinion (Ex. M).

In rejecting a similar "cumulative error" argument made by a § 2254 habeas petitioner, the Eleventh Circuit stated:  "The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim."  <u>Forrest v. Fla. Dep't of Corr.</u>, 342 F. App'x 560, 564 (11th Cir. 2009) (per curiam) (unpublished but recognized for persuasive authority). The <u>Forrest</u> panel further noted "[h]owever, the Supreme Court has held, in the context of an ineffective assistance claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.'"  *Id.* at 564–65 (quoting <u>United States v. Cronic</u>, 466 U.S. 648, 659 n.26, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)).

In light of <u>Cronic</u> and the absence of Supreme Court precedent applying the cumulative error doctrine to claims of ineffective assistance of counsel, the state court's rejection of Petitioner's claim is not contrary to or an unreasonable application of clearly established federal law.  *See* <u>Wright v. Van Patten</u>, 552 U.S. 120, 126, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008) ("Because our cases give no clear answer to the

question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law."); <u>Schriro v. Landrigan</u>, 550 U.S. 465, 478, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007) (The Arizona Supreme Court did not unreasonably apply federal law because "we have never addressed a situation like this."); <u>Reese v. Sec'y, Fla. Dep't of Corr.</u>, 675 F.3d 1277, 1287–88 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law."); *see also* <u>Morris v. Sec'y, Dep't of Corr.</u>, 677 F.3d 1117, 1132 (11th Cir. 2012) (refusing to decide whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law).

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate

is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 31st day of January 2017.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**